1
2
3
4
5
6             IN THE UNITED STATES DISTRICT COURT
7             FOR THE DISTRICT OF ARIZONA
8
9   Maria M. Thompson, et al.,          )   No. CIV 01-53-TUC-FRZ
                                        )
10           Plaintiffs,                )   **ORDER**
                                        )
11  vs.                                 )
                                        )
12                                      )
    City of Tucson Water Department, et al., )
13                                      )
             Defendants.                )
14                                      )
                                        )
15  _____ )

16       Pending before the Court is Defendant Mike Ring's Amended Renewed Motion for

17  Judgment as a Matter of Law.  Defendant's motion seeks to overturn the jury verdict in this

18  case which found that Ring had retaliated against Plaintiff Maria Thompson in violation of

19  her First Amendment rights; the jury awarded $30,000 in compensatory damages and

20  $50,000 in punitive damages against Ring. For the reasons stated below, the motion is

21  denied.[1]

22  **I. STANDARD OF REVIEW**

23      Judgment as a matter of law is appropriate only if "there is no legally sufficient

24  evidentiary basis" to find in favor of Plaintiff.  FED.R.CIV.P. 50; *see also  Pavao v. Pagay*,

25  307 F.3d 915, 918 (9th Cir. 2002)(a motion for judgment as a matter of law should be granted

26  _____

27       [1]The Court has determined that the issues have been fully and adequately briefed and that
28  oral argument would not aid the Court in its understanding of the issues.  Thus, the Court finds that
    this case is appropriate for resolution without oral argument.

1  only "if the evidence . . . permits only one conclusion, and that conclusion is contrary to the

2  jury's verdict."). "A jury's verdict must be upheld if it is supported by substantial evidence."

3  *Johnson v. Paradise Valley Unified School District*, 251 F.3d 1222, 1227 (9th Cir. 2001).

4  "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also

5  possible to draw a contrary conclusion from the same evidence." *Id.*; *see also Pavao*, 307

6  F.3d at 918 (same). "Thus, although the court should review the record as a whole, it must

7  disregard all evidence favorable to the moving party that the jury is not required to believe

8  . . . and may not substitute its view of the evidence for that of the jury." *Id.* Furthermore, in

9  reviewing a motion for judgment as a matter of law, the court must construe all the evidence

10 in the light most favorable to the nonmoving party, draw all reasonable inferences in favor

11 of the nonmoving party, and it may not make credibility determinations or weigh the

12 evidence. *See id.*[2]

13 **II.  FACTUAL BACKGROUND**

14     As a threshold matter, the Court notes that Defendant Ring's recitation of the facts in his

15 motion for judgment as a matter of law presents an overly sanitized, lopsided version of the

16 facts that does not comport with the governing standard for viewing the facts at this stage of

17 the litigation.  Rather, Ring's statement of the facts would be appropriate only if the court

18 drew numerous inferences in his favor, viewed much of the evidence in the light most

19 favorable to him, weighed the evidence, and otherwise viewed the facts in a manner

20 prohibited by the governing standard of review.  *See id.*

21

22

23

24     [2]The Court notes that the post-verdict Rule 50(b) motion, response, and reply were submitted

25 within the applicable time frames after the verdict in this case.  However, upon review of the briefs,
   the Court discovered that the parties did not cite to the official trial transcripts in the case, and

26 determined that this was necessary to properly resolve the motion.  As such, the parties were
   directed to obtain copies of the official trial transcripts, the official trial transcripts had to be

27 produced by the court reporter and entered into the record, and the parties were thereafter required

28 to submit amended briefs citing to the official trial transcripts in this case.

1       Applying the proper standard of review to the facts as discussed above, which includes

2    construing all the evidence in the light most favorable to Plaintiff and drawing all reasonable

3    inferences in Plaintiff's favor, the facts are as follows:

4       In 1994, Plaintiff Maria Thompson began working for the City of Tucson Water

5    Department ("Tucson Water").  *See* Brinson, Day 4 at 6-7[3]; Thompson, Day 2 at 6.

6    Thompson was employed as a water treatment plant operator and carried out her duties in

7    Tucson, Arizona at both the Hayden-Udall water treatment facility and the TARP water

8    treatment facility.  *See* Bailey, Day 2 at 49-50; Brinson, Day 4 at 15-16; Thompson, Day 2

9    at 7-12.  In relation to her duties as a water treatment plant operator, Thompson received

10   training in environmental technology, handling and responding to hazardous wastes and

11   chemicals, and training in the specifics of the water treatment plants such as designs,

12   logistics, chemical feed systems and applications of how to operate the water treatment

13   plants. *See* Thompson, Day 2 at 5-8. Her duties as a water treatment plant operator included

14   taking samples of water, conducting lab analysis of water samples, monitoring various water

15   sites and levels, and monitoring the water treatment equipment.  *See* Thompson, Day 2 at 7-

16   12. In addition to working at the Hayden-Udall facility, Thompson also began operating the

17   TARP plant on her own, and acquired so much knowledge of the operations of the TARP

18   facility that she eventually became responsible for training other operators to manage the

19   TARP plant.  *See* Thompson, Day 2 at 9-12; Brinson, Day 4 at 15-16; Bailey, Day 2 at 82-

20   86.  The TARP facility sits on a superfund site in Tucson where a large amount of

21   trichloroethylene (also referred to as "TCE" which is a dangerous chemical solvent) was

22   dumped, seeped into the groundwater, and contaminated the underground drinking water near

23   

24      [3]When the Court cites to the trial transcripts, it will cite to it as follows: (1) the last name of
     the person who testified to the relevant facts, (2) the day of trial when the testimony in question was

25   given, and (3) the pages where the testimony appears.  Thus, if the relevant testimony of Ed Brinson
     was on the fourth  day of trial and it appears at pages 6-7, it would be cited as follows: Brinson, Day

26   4 at 6-7.  The Court notes that the trial transcripts are partial  transcripts containing information
     relevant to the motion at bar.  *See* Doc. #'s 103, 124-130.  In addition, the Court notes that all of the

27   trial testimony of Maria Thompson was transcribed earlier in the case, and it is one consolidated

28   transcript containing her testimony on three separate days of trial.  *See* Doc. #103.

the airport in South Tucson.  *See* Uthe, Day 1 at 4; Thompson, Day 2 at 12-13; Wolf, Day 4 at 36.  The TARP facility was built in an effort to remove the TCE from the contaminated water in South Tucson.  *See* Uthe, Day 1 at 4; Thompson, Day 2 at 12-13; Wolf, Day 4 at 36.

Prior to Thompson's whistle blowing actions in approximately July of 1997, she received very good evaluations from her supervisors.  *See* Bailey, Day 2 at 80-86; Thompson, Day 2 at 20-27; Brinson, Day 4 at 7.  The Tucson Water evaluations graded seven areas, and prior to July 1997, the majority of the graded areas for Thompson were either marked outstanding or above average, Thompson never received any grade below average, and her attendance was reliable as she missed very minimal days of work.  *See* Bailey, Day 2 at 80-86; Thompson, Day 2 at 20-27.  Indeed, one of the senior water treatment plant operators who was a shift supervisor during this pre-July 1997 time period described Thompson as a "very dedicated, wanting to learn, outstanding" employee who showed up to work everyday and was reliable.  *See* Brinson, Day 4 at 7.  Prior to July of 1997, Thompson "loved" her work, did not have any problems with her superiors, and "felt things were wonderful" in her job as a water treatment plant operator for Tucson Water.  *See* Thompson, Day 2 at 20-23.

Beginning in July of 1997, there was a break in a large tank holding sulfuric acid at the TARP treatment facility.  *See* Thompson, Day 2 at 28, 37-38; Uthe, Day 1 at 7-8; Brinson, Day 4 at 8-10.  As such, sulfuric acid began leaking into the secondary containment area below the tank which consisted of a walled-in concrete barrier. *See* Thompson, Day 2 at 28, 37-38; Uthe, Day 1 at 7-8; Brinson, Day 4 at 8-10.  The sulfuric acid that had leaked out of the tank was contaminated with various materials, including metals as the acid had eaten away all the brackets and tie downs for the tank, paint that the acid had eaten away from the secondary containment, concrete that the acid was reacting with and eating away in secondary containment, and was also contaminated with bird feces, soda ash, and other debris that fell into or was dumped into the acid sitting in the secondary containment area. *See* Uthe, Day 1 at 15-16; Thompson, Day 2 at 28, 37-38; Brinson, Day 4 at 8-10; Wolf, Day 4 at 38-50.  As such, the approximately 6,000 to 7,000 gallons of sulfuric acid that leaked out

of the tank deteriorated into a hazardous waste that resembled a mass of black sludge[4] that was two feet deep along the walls of the secondary containment.  *See* Brinson, Day 4 at 8-10; Thompson, Day 2 at 37-38; Uthe, Day 1 at 15-16; Wolf, Day 4 at 44-46, 60.  Mike Ring, who was a supervisor at Tucson Water and one of Thompson's superiors in her chain of command, issued an order directing operators and maintenance personnel to collect the acid in question from the TARP facility, and to transport the acid from the TARP facility to the Hayden-Udall facility where it was disposed of and ultimately pumped into the water distribution system that provided drinking water for Tucson.  *See* Bailey, Day 2 at79; Uthe, Day 1 at 30-32; Thompson, Day 2 at 37-39; Brinson, Day 4 at 8-12; Wolf, Day 4 at 38-50.

The employees that collected, transported, and disposed of the hazardous waste either did not have any training whatsoever in handling or disposing of hazardous materials, or did not have updated training in handling or disposing of hazardous materials.  *See* Wolf, Day 4 at 38-50; Thompson, Day 2 at 28-36, 41-43; Thompson, Day 3 at 49-50; Uthe, Day 1 at 10-14.  These employees also did not have proper personal protective equipment to protect them against injuries in the course of handling and transporting this hazardous waste.  *See* Wolf, Day 4 at 38-50;  Thompson, Day 2 at 28-36, 41-43; Thompson, Day 3 at 49-50; Uthe, Day 1 at 10-14.  These employees pumped the hazardous waste out of the secondary containment area at the TARP facility into 55 gallon drums.  *See* Brinson, Day 4 at 8-12;Thompson, Day 2 at 28-43; Thompson, Day 3 at 49-50; Wolf; Day 4 at 38-50.   The drums containing

---

[4]Three eye witnesses, Thompson, Uthe and Brinson, said that the acid in secondary containment looked like "black sludge," that the acid had reacted with numerous materials such as metal, soda ash, concrete, paint, bird feces, and an expert testified that the waste acid could not be used for any legitimate purpose as it deteriorated into hazardous waste.  *See* Brinson, Day 4 at 8-10; Thompson, Day 2 at 37-38; Uthe, Day 1 at 15-16 Wolf, Day 4 at 44-46, 60.  The only person at trial that described it otherwise was Mike Ring who said that the acid in secondary containment was still useable, had no suspended materials in it, and it had the color and clarity of beer.  *See* Ring*,* Day 5 at 20, 63.  Relying and citing only to Ring's testimony, and failing to reference or cite any of the testimony or inferences favorable to Thompson, Defendant asserts that Ring correctly concluded that the acid was not hazardous waste and that employees therefore did not need any special training to handle the waste.  *See* Defendant's Amended Renewed Motion for Judgment as a Matter of Law at page 3, lines 4-11.

1  hazardous were loaded into a truck, the trucks drove the hazardous waste across town via a
2  public highway, and then the hazardous waste was removed from the drums at the Hayden-
3  Udall facility for disposal and ultimately introduced back into the drinking water.  *See*
4  Brinson, Day 4 at 8-12; Thompson, Day 2 at 28-43; Thompson, Day 3 at 49-50; Wolf; Day
5  4 at 38-50; Uthe, Day 1 at 10-14, 30-32.  The public was not warned about the transport of
6  this hazardous material across the public highway, the 55 gallon drums were not properly
7  labeled such that emergency responders could properly deal with an accident, leak or spill
8  of the waste on the public highway, and people actually transporting the hazardous waste
9  were not adequately trained to handle any such emergency.  *See* Thompson, Day 2 at 28-43;
10  Thompson, Day 3 at 49-50; Wolf; Day 4 at 38-50; Brinson, Day 4 at 8-12; Uthe, Day 1 at 10-
11  14.  This activity was occurring on numerous occasions over a period of numerous weeks.
12  *See* Thompson, Day 2 at 28-43; Thompson, Day 3 at 49-50; Uthe, Day 1 at 10-14; Brinson,
13  Day 4 at 8-12; Wolf; Day 4 at 38-50.  Two of the employees participating in these events
14  were actually splashed with this waste acid and injured.  *See* Thompson, Day 2 at 33; Uthe,
15  Day 1 at 11-12.

16  Initially, Thompson informed the other employees participating in these actions and her
17  direct supervisor that these activities were hazardous and illegal, that someone could be
18  injured, and asked them to cease with these activities, but her concerns were ignored.  *See*
19  Bailey, Day 2 at 78-79; Brinson, Day 4 at 12; Thompson, Day 2 at 28-29, 33, 39-40; Uthe,
20  Day 1 at 11-12.  In response to her concerns, her direct supervisor, Ted Bailey (his direct
21  supervisor was Mike Ring), refused to cease with these activities; his justification was that
22  Ring was the project manager, that this was the way Ring wanted things done and they would
23  continue to do it that way, and that Ring can do whatever he wants.  *See* Thompson, Day 2
24  at 39; Brinson, Day 4 at 12; Bailey, Day 2 at 79.

25  As Thompson was concerned that this activity was dangerous, that people could be
26  injured, and that this activity was illegal, she reported these events to the Tucson Fire
27  Department on eight to ten occasions in an effort to stop these activities.  *See* Uthe, Day 2

at 16; Uthe, Day 1 at 4-5, 10-11; Bailey, Day 2 at 78-79; Thompson, Day 2 at 28-43. Specifically, she contacted Daniel Uthe who was the Battalion Chief for the Tucson Fire Department; in this role, Uthe managed the Tucson Fire Department's fire prevention section which included the enforcement of fire codes in Tucson. *See* Uthe, Day 1 at 3-5; 10-11; Uthe, Day 2 at 16; Thompson, Day 2 at 28-43. The Tucson Fire Department has the authority to investigate and intervene in emergency situations, which includes the authority to assure the abatement of imminent hazards brought to its attention. *See* Uthe, Day 1 at 18-19.

As a result of the information provided by Thompson, Uthe launched an investigation into these activities which resulted in a stop work order being issued in August of 1997 that halted these activities. *See* Uthe, Day 1 at 14. While the stop order was in effect, Uthe conducted an investigation along with other government officials which confirmed that several employees handling the hazardous waste were never trained to handle such materials, that other employees were not certified to handle hazardous waste, that the employees did not have proper personal protective equipment, that they were ill-prepared to deal with a spill or other emergency, that the activities in question presented a risk to the public and the employees, and that two employees were injured in the process of handling the hazardous waste. *See* Uthe, Day 1 at 10-12; Uthe, Day 2 at 9-11.[5] In the course of his investigation,

---

[5]Ann Marie Wolf also offered expert testimony on this issue. *See* Wolf, Day 4 at 33-50. Wolf has a bachelors degree in biochemistry and chemistry, and a masters degree in chemical engineering. She is president of the Sonoran Environmental Research Institute, previously worked as an environmental engineer for Hughes Aircraft Company, and also served as the deputy director of the Pima County (which encompasses Tucson) Department of Environmental Quality where she oversaw the hazardous waste unit and the compliance and enforcement unit. *See* Wolf, Day 4 at 33-34. She concluded that the sulfuric acid in question had deteriorated into a hazardous waste and that she found "numerous violations. Too many to list. The major ones . . . were the illegal transport and disposal and handling of the hazardous waste or the waste sulfuric acid." *See* Wolf, Day 4 at 42-44. Wolf determined that officials at Tucson Water "mishandled the spill from the begining. They didn't report it. When you spill a large quantity of material, you need to report it to the proper authorities. They never reported it until months after the accident occurred." *See* Wolf, Day 4 at 46. She emphasized that "the whole part of that process was [flawed]. It was a hazardous waste. It wasn't transported correctly. It wasn't labeled correctly. Workers had not been trained. There was

---

- 7 -

1    Uthe had to meet with Ring in relation to these activities.  *See* Uthe, Day 1 at 10-12, 14, 31;

2    Uthe, Day 2 at 20-21.  Based on his investigation, Uthe concluded that Ring had lied to him

3    about the qualifications and training of the employees, Ring had lied to him about the use of

4    the hazardous waste, Ring had lied to him by providing documentation with contradictory

5    information, and Ring continued to transport the hazardous waste in violation of the stop

6    work order.  Uthe, Day 1 at 10-12, 14, 31; Uthe, Day 2 at 20-21.[6]  In addition to being

7    untruthful and uncooperative, Uthe concluded that Ring was trying to intimidate him;[7] Ring

8    was a big guy and would invade Uthe's personal space, get loud near Uthe,  interrupt during

9    meetings with Uthe, roll his eyes at Uthe, and was argumentative with Uthe.  *See* Uthe, Day

10   2 at 20-21.  As such, Uthe informed Tucson Water officials of his problems with Ring and

11   asked that they assign someone else from Tucson Water to deal with in the course of his

12   investigation.  *See* Uthe, Day 2 at 20-21.[8]

---

not a contingency plan.  It was taken across the public highway in a manner not consistent with how you transport hazardous waste.  They didn't again have the labeling.  They didn't have the placarding.  Then when they got to the facility, they illegally disposed of [the hazardous waste]."  *See* Wolf, Day 4 at 44.  Lastly, Wolf also concluded that the hazardous waste was  pumped back into Tucson's drinking water supply, and that the actions in question violated the Safe Water Drinking Act, the Resource Conservation and Recovery Act, and Arizona laws dealing with hazardous waste and the protection of drinking water.

[6]In addition, Ed Brinson, a long time employee of Tucson Water, witnessed Ring disposing of the hazardous waste acid on a weekend after the stop work order was issued.  *See* Brinson, Day 4 at 10.  Brinson also testified that bringing employee complaints or concerns to Ring "was a waste of time . . . [because Ring] does what he wants, when he wants, and no one controls him or influences him below him."  *See* Brinson, Day 4 at 14-15.

[7]Thompson's supervisor, Bailey (who was supervised by Ring), also stated that "Ring was quite vocal and volatile in his nature.  He's very intimidating. [Ring] has stated that he uses intimidation and fear as a management style."  *See* Bailey, Day 2 at 58.  Bailey stressed that bringing any of Thompson's concerns or complaints to Ring would not resolve anything.  *See* Bailey, Day 2 at 58.

[8]The investigation into the hazardous waste activities and related issues continued for at least two years.  *See* Uthe, Day 2 at 28-29; Wolf, Day 4 at 44-46.  Uthe testified that Tucson Water swept things under the rug, was uncooperative, and otherwise failed to address issues in the course of the investigation.  *See* Uthe, Day 2 at 28-29; Wolf, Day 4 at 38-50.

1       In approximately August of 1997, after Thompson reported her concerns to the Tucson

2   Fire Department and the stop work order was issued, Ring confronted Thompson at work in

3   front of numerous employees in the control room.  *See* Thompson, Day 3 at 55-57, 129;

4   Thompson, Day 6 at 189, 193-194; Brinson, Day 4 at 15.  While Thompson was in the

5   control room with other employees at work, Ring angrily stomped into the room flailing his

6   arms, got into Thompson's face, slammed a huge book right next to her, stared directly at her

7   and said who is the fucking idiot that called the fire department.[9]  *See* Thompson, Day 3 at

8   55-57, 129; Thompson, Day 6 at 189, 193-195; Brinson, Day 4 at 15.  Ring paused to see

9   what her reaction was and said that our lives are going to be made hell, we have to watch our

10  backs, we have the fire department looking over our shoulders now.  *See* Thompson, Day 3

11  at 55-57, 129; Thompson, Day 6 at 189, 193-194; Brinson, Day 4 at 15.  Subsequent to this

12  confrontation, Thompson had approximately ten more encounters with Ring that were similar

13

14

15      [9]The Court notes that Defendant asserts in his motion that Ring had no clue whatsoever that

16  Thompson was the whistle blower that called the fire department until May of 1998.  *See* Defendant's Amended Renewed Motion for Judgment as a Matter of Law at page 5 (line 20) to page

17  6 (line 4).  This is another example of the numerous times that Defendant states facts from the trial whereby the facts are viewed in the light most favorable to him, the reasonable inferences are drawn

18  in his favor, evidence is weighed, and other favorable evidence and inferences in favor of Thompson are simply ignored and not cited for the Court's review.  Thompson testified that she called Uthe

19  from the fire department to report her concerns as early as July 1997.  *See* Thompson, Day 1 at 33-35.  In addition, Uthe testified that a stop work order pertaining to the handling of the hazardous

20  waste was issued on approximately August 1, 1997 due to the initiation of his investigation.  *See* Uthe, Day 1 at 14.  Furthermore, contrary to the impression advanced by Defendant, Thompson did

21  not act in a stealth manner in regards to her concerns; rather, as soon as she saw the activities at issue in this case in July of 1997, she told her direct supervisor and the employees participating in

22  the activities that they should cease handling the hazardous waste, that they could be injured, and that their actions were in violation of the law.  *See*  Bailey, Day 2 at 78-79; Brinson, Day 4 at 12;

23  Thompson, Day 2 at 28-29, 33, 39-40; Uthe, Day 1 at 11-12.  In addition, Uthe told other people in his chain of command at the fire department that Thompson was the whistle blower; Fred Shipman,

24  who was Chief of the Tucson Fire Department at the time, was in Uthe's chain of command and reprimanded and threatened him with  discipline if Uthe did not back off of his investigation.  *See*

25  Uthe, Day 2 at 26-27, 38.  Thus, in approximately August of 1997, when Ring confronted Thompson, got in her face, slammed a huge book next to her, stared directly at her and said who is

26  the fucking idiot that called the fire department, it would not be a huge leap in logic for a jury to reasonably infer that Ring knew (from other employees at Tucson Water or the fire department) that

27  Thompson was the whistle blower that was calling the fire department.

28

to this incident through 1998.  *See* Thompson, Day 56.  In addition, it became a daily issue when she would "cross paths [with Ring] noting his anger and his animosity."  *See* Thompson, Day 3 at 62.  Thompson missed numerous days at work because it "was very stressful because I kept telling [Tucson Water management] that [Ring] was running around like a nut, screaming a F[ucking] idiot called the fire department, slamming huge notebooks around me, being very, very physical in my face . . . And it's not just the foul language.  It was the physical intimidation and coming up right up into my face to do what [Ring] did . . . [I had] to be careful to watch my back.  We work around a very dangerous place.  There were at least two nights out of the week that I was on site by myself on shift work, graveyards . . ."  *See* Thompson, Day 6 at 189.

In September of 1997, shortly after the first confrontation with Ring in the control room, Thompson was working at the TARP facility; she was attempting to resolve a problem in relation to a sump alarm in a chemical area of the facility.  *See* Thompson, Day 1 at 57.  On that occasion, the sampling analyzer in the lines had a problem with clogs, and Ring was also summoned to the facility to help resolve the problem.  *See* Thompson, Day 1 at 57.  Thompson was already near the pit/sump area working on the problem when Ring arrived; when he saw Thompson, he was visibly annoyed and became more angry and started to cuss as he was working around Thompson in the sump area.  *See* Thompson, Day 3 at 57-58, 127.  Ring looked at Thompson several times, threw the sump pump that he was working on directly at her, but she was able to move out of the way before the pump hit her.  *See* Thompson, Day 3 at 57-58, 127.  That same month, in September of 1997, Thompson was taken off the rotation of operators that worked at the TARP facility and no longer was given any other duties at the TARP facility.  *See* Thompson, Day 2 at 37.  Although Thompson loved her duties at the TARP facility, had operated the TARP facility by herself for a period of time, and was asked to train others how to operate the TARP facility, she was stripped of her duties on the TARP facility rotation and other less senior operators were placed on the

TARP facility rotation.[10]   *See* Thompson, Day 2 at 9-12, 20, 37; Brinson, Day 4 at 15-16; Bailey, Day 2 at 82-86.

Subsequently, in 1998, Thompson was on duty as the operator in the pipe gallery at the Hayden-Udall water treatment plant.  *See* Thompson, Day 3 at 60-62, 64.  She was running the equipment at the time and was taken off guard when she discovered that maintenance personnel were working on the ozone destruct unit at the same time.  *See* Thompson, Day 3 at 60-62, 64.  This disturbed Thompson as she was working with ozone, and as she wasn't notified by maintenance personnel prior to their actions pursuant to standard operating procedures, she did not have the chance to insure her own safety by turning off and purging the necessary equipment.  *See* Thompson, Day 3 at 60-62, 64.  When she confronted the maintenance worker about her safety concerns and failure to follow procedures, she was simply told that he had a work order and told her to talk to Ring (who was on site and the superior to these maintenance personnel) if she had a problem.  *See* Thompson, Day 3 at 60-62, 64.  As such, she approached Ring, told him her concerns, and he just said okay, turned his back on her and walked away.  *See* Thompson, Day 3 at 60-62, 64.  Then, still within Ring's presence, another maintenance employee screamed and cussed at Thompson because he disagreed with her complaints about their actions; again, Ring did nothing.  *See* Thompson, Day 3 at 60-62, 64.[11]

---

[10]Although there was no direct evidence that Ring ordered that Thompson be removed from the operators working on the TARP facility rotation, the circumstantial evidence in this case certainly supports the reasonable inference that Ring took Thompson off the TARP rotation in retaliation for her whistle blowing. *See Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1030 (9th Cir. 2006)(recognizing that direct and circumstantial evidence are entitled to equal weight, that juries are routinely instructed that the law makes no distinction between direct and circumstantial evidence, that circumstantial evidence is routinely used to support criminal convictions even though proof beyond a reasonable doubt is required, and "that circumstantial evidence may be more certain, satisfying and persuasive than direct evidence")

[11]From the circumstantial evidence discussed above, a jury could reasonably infer that Ring ordered the maintenance personnel to engage in these dangerous actions.  *See Cornwell*, 439 F.3d at 1030.

1    Due to these numerous actions taken against her at work, Thompson felt physically
2    intimidated by Ring while she was at work, and she felt that she had to be careful to watch
3    her back while at work.  *See* Thompson, Day 6 at 189; Thompson, Day 3 at 64, 72, 84-85.
4    As Thompson felt that she was a target that had been set up on numerous occasions, and she
5    encountered dangerous situations that jeopardized her safety, she was scared while at work
6    and often otherwise afraid to go to work.  *See* Thompson, Day 6 at 189; Thompson, Day 3
7    at 64, 72, 84-85.  As such, due to the numerous actions and circumstances caused by Ring,
8    Thompson eventually missed approximately 36.5 days of work during a period of time while
9    working as an operator at Tucson Water.  *See* Thompson, Day 3 at 83-85.  As mentioned
10   above, prior to July 1997, the majority of the graded areas (a total of 7) for Thompson's
11   evaluations were either marked outstanding or above average, Thompson never received any
12   grade below average, and her attendance was reliable as she missed very minimal days of
13   work; further a senior operator and shift supervisor described Thompson as a "very
14   dedicated, wanting to learn, outstanding" employee who showed up to work everyday and
15   was reliable.  *See* Bailey, Day 2 at 80-86; Thompson, Day 2 at 20-27; Brinson, Day 4 at 7.
16   In contrast, when she received her evaluation in October of 1998, 3 categories were marked
17   below average, 3 categories were marked average, and only one category was marked above
18   average.  *See* Bailey, Day 2 at 87-88.  The October 1998 evaluation also states that
19   Thompson fails to meet the standard for attendance and dependability.  *See* Bailey, Day 2 at
20   87-88.     Although Thompson's direct supervisor drafted the evaluation, Ring actually
21   reviewed the evaluation, gave his final approval of the October 1998 evaluation, and signed
22   off on the evaluation on October 16,1998.[12]  *See* Bailey, Day 2 at 93-95.  As a result of the

23

24         [12]Ring had the authority to change the October 1998 evaluation.  *See* Bailey, Day 2 at 97-98.
     Originally, Bailey included negative comments about Thompson's absenteeism and her continued
25   complaints about the handling of the hazardous waste.  *See* Bailey, Day 2 at 97-98.  Ring directed
     Bailey to remove comments about absenteeism because a portion of that time was covered by the
26   Family Medical Leave Act.  *See* Bailey, Day 2 at 97-98.  In addition, Ring told Bailey to remove any
     mention of Thompson's continuing complaints about safety regarding the improper handling of the
27   hazardous waste.  *See* Bailey, Day 2 at 97-98.  Defendant argues that Ring's only contribution to the
     October 1998 evaluation was his directive to remove these two negative comments.  However, as

28

poor October 1998 evaluation, her direct supervisor informed Thompson that she would not receive a merit raise in pay.  *See* Thompson, Day 3 at 113-115, 157-158, 188.[13]

## III.  DISCUSSION

### A.  Complete Waiver of the Qualified Immunity Defense

As a threshold matter, Thompson argues that Defendant has completely waived his ability to assert any qualified immunity defense.  *See* Thompson's Objection to Defendants' Amended Renewed Motion for Judgment as a Matter of Law at 5-6.  To support this argument, Thompson cites *Saucier v. Catz*, 533 U.S. 194 (2001), which states in relevant part:

> Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation . . . The privilege is an *immunity from suit* rather than a mere defense to liability, and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial . . . As a result, we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.

---

discussed above, Defendant fails to recognize that Ring's numerous retaliatory actions against Thompson physically intimidated her, placed her in dangerous situations that jeopardized her personal safety, and otherwise caused her to fear going to work such that she missed numerous days of work; therefore, she received a poor evaluation in October of 1998 that graded her below average in 3 areas, described her as unreliable, and resulted in Thompson not receiving her merit pay increase.  Ring obviously knew of his own actions that caused this poor evaluation of Thompson, had the authority to change this poor evaluation, but instead chose to give his final approval of this poor evaluation on October 16, 1998.

[13]The Court notes that Defendant states in his motion several times that many of the facts fall outside the statute of limitations.  Not surprisingly, though, Defendant fails to acknowledge that the Court already determined that all of the facts discussed above are appropriately considered as part of a continuing violation pursuant to a campaign of harassment; as such, the retaliatory harassment that fell within and outside the statute of limitations are appropriately considered and not barred by the statute of limitations.  *See RK Ventures, Inc.*, 307 F.3d at 1061 n.13 ("With respect to hostile work environment claims, . . . *Morgan* held that 'the entire time period of the hostile work environment may be considered by a court for the purposes of determining liability' as long as one 'act contributing to the claim occurs within the filing period.'" (quoting *Morgan*, 536 U.S. at 117, 122 S. Ct. at 2074)); *see also Morgan*, 536 U.S. at 115, 122 S. Ct. at 2073 (hostile environment claims "cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.").

*Id.* at 200-201 (emphasis in the original).  As Thompson correctly argues, Defendant failed to argue the qualified immunity defense in any motion prior to trial.  Rather, Defendant simply asserted qualified immunity in his answer, proposed pretrial order, and a pretrial memorandum.  As Defendant failed to argue the qualified immunity issue in an actual motion prior to trial, Defendant never properly raised the issue for the Court's resolution.  Instead, only after Thompson's case rested after four days of testimony to the jury, Defendant raised the qualified immunity defense for the first time in his Rule 50 motion for judgment as a matter of law.  *See* FED.R.CIV.P. 50.

As Defendant's attorney, Lyle Aldridge, stressed during his argument pertaining to the Rule 50 motion on the fourth day of trial:

> But first and foremost, I think the fact is that these defendants should never have been required to go to trial.  **It is my fault.  I looked at the motion for summary judgment and could not believe it when I looked at it that the good faith immunity defense wasn't raised in those monster motions that I filed**.

*See* Statements of Defendant's attorney, Lyle Aldridge, on Day 4 of the Trial at page 89.

The Court agrees with both Thompson and Lyle Aldridge that the qualified immunity defense should have been raised long before the fourth day of the jury trial.  In addition, pursuant to the plain language of *Saucier* cited above, it would seem appropriate that Defendant should be precluded from arguing qualified immunity on the fourth day of trial where Defendant failed to raise the argument in any previous motion.  Nonetheless, there is case law from the Ninth Circuit indicating that a defendant can raise the qualified immunity defense in a Rule 50 motion.[14]  *See Kelly v. City of Oakland*, 198 F.3d 779, 784 (9th Cir. 1999); *Forrett v. Richardson*, 112 F.3d 416, 419 (9th Cir. 1997)**,** overruled on other grounds,

---

[14]The Court notes, however, that the Ninth Circuit case law doesn't address the exact issue before the Court.  While there is case law indicating that qualified immunity can be raised in a Rule 50 motion, the case law does not address whether qualified immunity can be considered waived by a defendant where he raises the issue in a motion for the first time on the fourth day of trial.  It seems equitable to hold that waiver would apply in such circumstances.  However, as the Ninth Circuit has generally found that qualified immunity can be raised in a Rule 50 motion, the Court will err on the side of caution and find that the qualified immunity defense has not been waived.

1    *Chroma Lighting v. GTE Products Corp.*, 127 F.3d 1136 (9th Cir. 1997).  Therefore, the

2    Court finds that Defendant is not completely precluded from raising the defense of qualified

3    immunity.

4    **B.   Partial Waiver of the Qualified Immunity Defense to the Extent it is Based on the
         Balancing of Interests between a Public Employee and Public Employer**

5

6        As of the 1998 time frame pertaining to the actions in this case, the clearly established law

7    for establishing liability for a First Amendment retaliation claim in the public employment

8    context included an analysis of the following: (1) whether an employee made statements

9    pertaining to a matter of public concern; (2) whether the employer took an adverse action

10   against the employee in retaliation for the statements pertaining to the matter of public

11   concern; and (3) whether the employee's interest in commenting upon matters of public

12   concern outweighed the employer's interest in promoting workplace efficiency and avoiding

13   disruption.  *See*, *e.g.*, *Thomas v. Carpenter*, 881 F.2d 828, 829-831 (9th Cir. 1989); *Allen v.*

14   *Scribner*, 812 F.2d 426, 430-434 (9th Cir. 1987); *Sanchez v. City of Santa* Ana, 936 F.2d

15   1027, 1038 (9th Cir. 1991); *Clark v. Yosemite Community College* District, 785 F.2d 781,

16   789-790 (9th Cir. 1986); *Lambert v. Richard*, 59 F.3d 134, 135-137 (9th Cir. 1995); *Haimowitz*

17   *v. University of Nevada*, 579 F.2d 526, 529-530 (9th Cir. 1978); *McKinley v. City of Eloy*, 705

18   F.2d 1110, 1113-1116 (9th Cir. 1983).

19       In Defendant's Amended Renewed Motion for Judgment as a Matter of Law, he argues

20   that as applied to the circumstances of this case, the law wasn't clearly established in 1998

21   in regards to the balancing of Thompson's interest in expressing herself on a matter of public

22   concern versus her employer's interest in promoting workplace efficiency and avoiding

23   disruption.  *See Pickering v. Board of Education*, 391 U.S. 563 (1968); *Connick v. Myers*,

24   461 U.S. 138 (1983).

25       As Defendant failed to argue the balancing test in his Rule 50(a) motion on the fourth day

26   of trial, Plaintiff argues that Defendant is precluded from asserting the qualified immunity

27   defense in his Rule 50(b) renewed motion for judgment as a matter of law to the extent it is

28

based on the balancing test portion of the elements required to support a First Amendment

retaliation claim.  The Court agrees.  As the Ninth Circuit has emphasized:

> Federal Rule of Procedure 50(a) permits a party to move for judgment as a matter of law after the opposing party has been fully heard and prior to the submission of the case to the jury . . . If such a motion made at the close of all the evidence is denied, Rule 50(b) allows the moving party to 'renew' its motion within ten days after the court's entry of final judgment in the case . . . A party cannot raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion . . . The purpose of this rule is twofold. First it preserves the sufficiency of the evidence as a question of law, allowing the district court to review its initial denial of judgment as a matter of law instead of forcing it to engage in an impermissible reexamination of facts found by the jury . . . Second, it calls to the court's and the parties' attention any alleged deficiencies in the evidence at a time when the opposing party still has an opportunity to correct them.

*See Fruend v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003)(reversing the district

court's order granting defendant's Rule 50(b) motion because the district court granted the

Rule 50(b) motion based on an argument that defendant failed to initially raise in its Rule

50(a) motion)(internal quotes and citations omitted); *see also Murphy v.* City of Long Beach,

914 F.2d 183, 186 (9th Cir. 1990)("[Judgment notwithstanding the verdict] is improper if

based upon grounds not alleged in a directed verdict [motion]"; reversing the district court's

order granting the Rule 50(b) motion because it was based on an argument that defendant

failed to raise in the Rule 50(a) motion); *Lifshitz v. Walter Drake & Sons, Inc.*, 806 F.2d

1426, 1429 (9th Cir. 1986)(a party may secure a Rule 50(b) judgment notwithstanding the

verdict only based on the specific grounds initially raised in the Rule 50(a) motion for a

directed verdict; "If this were not so, the directed verdict motion would not serve its purpose

of providing clear notice of claimed evidentiary insufficiencies and of preserving the issue

of the sufficiency of the evidence on a particular matter as a question of law"; affirming the

district court's rejection of an argument made in the Rule 50(b) motion because defendant

failed to raise it in the Rule 50(a) motion).[15]

_____

[15]A review of Defendants Amended Renewed Motion for Judgment as a Matter of Law (page 2, line 17 to page 3, line 15) and his related Reply Brief (pages 2-3) shows that Defendant fails to actually cite any Ninth Circuit authority pertaining to the requirement that the Rule 50(b) motion

A review of the record shows that the sole focus of Defendant's initial Rule 50(a) motion on the fourth day of trial was that Thompson failed to establish an adverse employment action sufficient to support a First Amendment retaliation claim, and that the law pertaining to any adverse actions alleged by Plaintiff was not clearly established such that the qualified immunity defense shielded Ring from damages. *See* Day 4 of Trial at 76-97, 111-126; Day 6 of Trial at 89-90.[16]  Indeed, Defendant made a single passing reference to *Pickering* and *Connick* during the initial Rule 50(a) motion on the fourth day of trial. *See* Day 4 of Trial at 80.  This single reference was all in the context of Defendant's argument that there was no legally cognizable adverse action. *See* Day 4 of Trial at 76-97, 111-126; Day 6 of Trial at 89-90.  Further, Defendant never even mentioned the term balancing test, balancing interests, or otherwise discussed how the employee's interest in commenting upon matters of public concern was outweighed by the employer's interest in promoting workplace efficiency and avoiding disruption.  *See* Day 4 of Trial at 76-97, 111-126; Day 6 of Trial at 89-90.  Furthermore, a review of Thompson's response to Defendant's Rule 50(a) motion bolsters the fact that the balancing test was not an issue remotely raised by Defendant as Plaintiff's response was also solely focused on whether there was a cognizable adverse action. *See* Day 4 of Trial at 97-109.  In addition, there was an extended discussion between the Court and Defendant regarding the arguments made by Defendant in his Rule 50(a) motion, and the Court also focused only on the issue of whether there was a cognizable adverse employment

---

can only be based on arguments specifically made pursuant to the initial Rule 50(a) motion.  Rather, Defendant ignores controlling Ninth Circuit authority, and simply cites to non-binding favorable case law from other Circuits.  As with Defendant's lopsided recitation of the facts, this is one of numerous examples where Defendant continues to paint a picture of an area of law based on the narrow citation of a handful of cases, without recognizing many other cases in the area of law that show otherwise.  As discussed later in this Order, Defendant does the same thing in regards to what constituted a sufficient retaliatory act to support a claim of First Amendment retaliation in approximately 1998.

[16]All of Defendant's arguments pertaining to the First Amendment retaliation claim in his Rule 50(a) motion are included in the above cited pages on the fourth day of trial.  On the sixth day of trial, Defendant again raised his Rule 50 arguments made on the fourth day of trial, but he did not make any additional arguments.

1    action as that was the only issue actually raised by Defendant.  *See* Day 4 of Trial at 111-126.

2    Accordingly, pursuant to the foregoing discussion, Defendant is precluded from relying on

3    the balancing of interests test as a basis for avoiding damages in his post-verdict Rule 50(b)

4    motion.  *See Fruend v. Nycomed Amersham*, 347 F.3d at 761; *Murphy*, 914 F.2d at 186;

5    *Lifshitz*, 806 F.2d at 1429**.**

6    Assuming, *arguendo*, that Defendant had preserved the argument that qualified immunity

7    was applicable pursuant to the balancing test in question, Defendant would still lose on the

8    merits.  Qualified immunity is a three part analysis that considers whether a violation of a

9    constitutional right has been shown, whether the law was clearly established at the time the

10   constitutional deprivation occurred, and whether a reasonable official would recognize that

11   his actions violated clearly established law.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001);

12   *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002); *Cruz v. Kauai County*, 279 F.3d 1064,

13   1068 (9th Cir. 2002).  As of approximately 1998, the balancing test in question was

14   exhaustively analyzed by the Ninth Circuit and the law in this area was clearly established

15   in the Ninth Circuit.  *See, e.g.*, *Thomas v. Carpenter*, 881 F.2d 828, 829-831 (9th Cir. 1989);

16   *Allen v. Scribner*, 812 F.2d 426, 430-434 (9th Cir. 1987); *Sanchez v. City of Santa* Ana, 936

17   F.2d 1027, 1038 (9th Cir. 1991); *Clark v. Yosemite Community College* District, 785 F.2d

18   781, 789-790 (9th Cir. 1986); *Lambert v. Richard*, 59 F.3d 134, 135-137 (9th Cir. 1995);

19   *Haimowitz v. University of Nevada*, 579 F.2d 526, 529-530 (9th Cir. 1978); *McKinley v. City*

20   *of Eloy*, 705 F.2d 1110, 1113-1116 (9th Cir. 1983).

21   Under this clearly established law, the analysis encompasses the totality of the

22   circumstances pertaining to the content, form and circumstances of the speech, and a clear

23   distinction is drawn between the value of individual personnel disputes and grievances that

24   is of little or no relevance to the public's concerns with the operation of government, versus

25   information relevant to the public's  concerns and evaluation of the government such as

26   threats to safety and welfare, abuse of power, fraud, corruption, unethical behavior,

27   incompetence, misuse of resources, mismanagement, government inefficiency, and waste.

28

*See id.*  The balancing test also considers whether the speech in question impairs discipline or control by superiors, disrupts coworker relations, erodes close working relationships premised on personal loyalty and confidentiality, interferes with the speaker's performance of his or her duties, or obstructs the routine operation of the office.  *See id.*  Under the specific circumstances of this case, it is abundantly clear that Thompson's speech pertained to a matter of public concern; her whistle blowing was an effort to protect the safety of both other employees and the public in the face of Ring's directive involving the dangerous handling, disposal, and transportation of hazardous waste.  Further, to the extent there was any disruption to the workplace, it was caused by Ring's retaliatory actions and his insistence on pursuing a course of illegitimate activity that presented a threat to human safety.  Thompson's interest in advancing speech that exposed and prevented these continued activities certainly outweighed her public employer's interest in maintaining workplace efficiency and avoiding disruption; a reasonable official would have known that the conduct that occurred in this case was a violation of clearly established law.  *See id.*  As Defendant is precluded from relying on the balancing test to avoid damages, and Defendant loses on the merits as qualified immunity based on the First Amendment retaliation balancing test, Defendant's argument related to this issue is rejected.[17]

---

[17]The Court notes that Thompson also argues that Defendant waived any objection to jury instructions; however, the Court need not address this argument as the detailed discussion later in this order shows that the jury instructions given at trial were correct and consistent with the law in the Ninth Circuit at both the time of trial and at the time of the events in this case in approximately 1998.  The Court also notes that Defendant complains in his Rule 50(b) motion that the Court cited law that post-dated the events in this case in the Summary Judgment Order.  This is a curious complaint as it is Defendant's attorney, Lyle Aldridge, that failed to raise the qualified immunity defense in his "monster" motions for summary judgment and stated that the deficiency was solely his fault.  If Defendant had actually raised the qualified immunity defense prior to the fourth day of trial, such as in a motion for summary judgment, the Court would have obviously discussed the state of the clearly established law in 1998 pertaining to adverse actions in the First Amendment retaliation context.

1

## C.  <u>Qualified Immunity and a Cognizable Adverse Employment Action</u>

2

3       As discussed above, the only argument Defendant preserved to support his Rule 50(b)

4  motion is that Thompson failed to demonstrate a cognizable adverse employment action and

5  that qualified immunity applies because there was no clearly established law recognizing the

6  adverse employment actions at issue in this case.  The Court disagrees as the actions taken

7  against Thompson rose to the level of cognizable adverse employment actions pursuant to

8  clearly established Ninth Circuit case law in approximately 1998.[18]  *See*, *e.g.*, *Boyd v. Benton*

9  *County*, 374 F.3d 773, 781 (9th Cir. 2004)("If the right is clearly established by the decisional

10 authority of the Supreme Court or of this Circuit our inquiry should come to an end.");

11 *Rivero v. San Francisco*, 316 F.3d 857, 865 (9th Cir. 2002)(finding that a split in the Circuits

12 did not render the law unclear in the Ninth Circuit before the U.S. Supreme Court resolved

13 the split; the Supreme Court's resolution of the split in this case merely confirmed the already

14 clear law in the Ninth Circuit); *Deorle v. Rutherford*, 272 F.3d 1272, 1286 (9th Cir. 2001)(the

15 law can be clearly established even if there is not a prior case resolving the exact issue at bar;

16 "Otherwise, officers would escape responsibility for the most egregious forms of conduct

17 simply because there was no case on all fours prohibiting that particular manifestation of

18 unconstitutional conduct."); *Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001)(en

19 banc)(holding that the law can be clearly established even when there is no precedent on

20 point where general constitutional principles give officials "fair and clear warning" that their

21 conduct is unconstitutional); *Ostlund v. Bobb*, 825 F.2d 1371 (9th Cir. 1987), *cert. denied*,

22 486 U.S. 1033 (1988)(holding that the defendants "cannot use the absence of case law

23

24 _____

25       [18]As the Court has already discussed the three part test for qualified immunity, the clearly established law in 1998 pertaining to the elements to support a First Amendment retaliation claim,
26 the clearly established law in 1998 pertaining to matters of public concern and balancing interests of the employee and employer, and has found that Thompson spoke on a matter of public concern
27 and the balancing of interests tips in her favor, the Court will not repeat that entire discussion in this section of the Order.  Rather, the Court will only address these issues as necessary to resolve the
28 adverse employment action issue raised by Defendant.

1  directly on point to shield them from liability.  The unlawfulness of their conduct should

2  have been apparent to them in light of preexisting case law.").

3      As of 1998, there was a wealth of case law in the Ninth Circuit discussing what retaliatory

4  actions were sufficient to support a First Amendment retaliation claim.  *See*, *e.g.*, *Thomas v.*

5  *Carpenter*, 881 F.2d 828, 829-831 (9th Cir. 1989); *Allen v. Scribner*, 812 F.2d 426, 430-434

6  (9th Cir. 1987); *Sanchez v. City of Santa* Ana, 936 F.2d 1027, 1038 (9th Cir. 1991); *Clark v.*

7  *Yosemite Community College* District, 785 F.2d 781, 789-790 (9th Cir. 1986); *Gibson v.*

8  *United States*, 781 F.2d 1334, 1338 (9th Cir. 1986); *Lambert v. Richard*, 59 F.3d 134, 135-

9  137 (9th Cir. 1995); *Haimowitz v. University of Nevada*, 579 F.2d 526, 529-530 (9th Cir.

10  1978); *McKinley v. City of Eloy*, 705 F.2d 1110, 1113-1116 (9th Cir. 1983).  A review of

11  these cases demonstrates that the crux of what qualified as a cognizable retaliatory action for

12  purposes of liability for First Amendment retaliation was whether the action was likely to

13  deter an employee from exercising her First Amendment right to speak on a matter of public

14  concern.  *See Thomas v. Carpenter*, 881 F.2d 828, 829-830 (9th Cir. 1989)("[s]tate action

15  designed to retaliate against and chill political expression strikes at the heart of the First

16  Amendment."; reasoning that actions that discourage or otherwise have an impermissible

17  chilling effect are sufficient retaliatory acts to support a First Amendment retaliation

18  claim)(internal quotes and citations omitted); *Allen v. Scribner*, 812 F.2d 426, 434 n. 16 &

19  17 (9th Cir. 1987)(holding that a retaliatory action is prohibited where it has "an

20  impermissible chilling effect on . . . constitutionally protected speech; citing with approval

21  numerous cases discussing cognizable retaliatory actions as those that chill, deter, and

22  discourage the exercise of constitutionally protected speech); *Gibson v. United States*, 781

23  F.2d 1334, 1338 (9th Cir. 1986)("State action designed to retaliate against and chill political

24  expression strikes at the heart of the First Amendment . . . Accordingly, the victim of such

25  action is entitled to sue the responsible state agents under section 1983.").

26      The Ninth Circuit analyzed retaliatory actions in this manner because it is "axiomatic that

27  speech concerning public affairs is more than self-expression; it is the essence of self-

28

government . . . speech on public issues occupies the highest rung of First Amendment values, and is entitled special protection . . . The expressly guaranteed freedoms of the first amendment share a common core purpose of assuring freedom of communication on matters relating to the functioning of government." *McKinley v. City of Eloy*, 705 F.2d 1110, 1113-1114 (9th Cir. 1983)(internal quotes and citations omitted); *Allen v. Scribner*, 812 F.2d 426, 431 (9th Cir. 1987)("speech that concerns issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government merits the highest degree of first amendment protection.")(internal quotes and citations omitted).  In light of the special protection accorded to speech on matters of public concern, the Ninth Circuit recognized that "conduct used to discourage the exercise of first amendment freedoms need not be particularly great in order to find that rights have been violated; for example, rights are infringed both where the government fines a person a penny for being a Republican and where it withholds the grant of a penny for the same reason."  *Thomas v. Carpenter*, 881 F.2d 828, 830 (9th Cir. 1989)(internal quotes omitted)(quoting and citing *Elrod v. Burns*, 427 U.S. 347, 359 n. 13 (1976)).

Accordingly, the crux of the inquiry is whether the retaliatory action likely deterred constitutionally protected speech, and such retaliatory action need not be particularly great to support a First Amendment retaliation claim.  Thus, the Ninth Circuit has found a very wide array of retaliatory acts legally sufficient to support a First Amendment retaliation claim, including a retaliatory campaign of harassment, removing job responsibilities, interference with work duties, failing to renew the contract of a non-tenured teacher on probationary status, dismissing an individual from a volunteer position with the government, job transfers without any loss in pay or status, negative evaluations, letters of reprimand, and selective enforcement and application of work rules.[19]  *See Thomas v. Carpenter*, 881 F.2d

---

[19]According to Defendant, as reflected in his Rule 50(a) motion and continued in the Rule 50(b) motion at bar, he would have the Court believe that only an action that has some corresponding financial impact qualified as a sufficient retaliatory action in approximately 1998. For example, while arguing his Rule 50(a) motion on the fourth day of trial, Lyle Aldridge stressed:

828, 829-830 (9th Cir. 1989)(removing job responsibilities was a sufficient retaliatory action to uphold plaintiff's First Amendment retaliation claim; plaintiff was excluded from departmental meetings, policy manual revision meetings, and excluded from evaluating training exercises); *Allen v. Scribner*, 812 F.2d 426, 428-429, 434 n. 16 & 17 (9th Cir. 1987)(campaign of harassment was sufficient retaliatory action to uphold plaintiff's First Amendment retaliation claim; the harassment consisted of plaintiff being transferred to a new assignment that included clerical tasks unrelated to plaintiff's training, negative statements discrediting plaintiff, and threats and intimidation; the court emphasized that "Even if the tasks [plaintiff] was made to perform were commensurate with his training and experience, they were significantly different from the field work he had been performing . . . and [management] certainly knew that would be the case. If [plaintiff] reasonably felt that office work was less desirable than field work, his reassignment might have had an impermissible chilling effect on his constitutionally protected speech . . . While the individual incidents of verbal intimidation and abuse may seem insubstantial, we cannot say as a matter of law that the exercise of first amendment rights was not deterred. [Plaintiff] has alleged an entire campaign of harassment which though trivial in detail may have been substantial in gross"; the court also recognized that retaliatory negative evaluations and transfers can support a

---

"I just do not see how anybody can think that there was - that there is evidence in this case that would overcome good faith immunity under the law that applied under §1983 in the years 1997, 1998, and 1999 . . . There is nothing.  I mean, the law at this time was very clear that unless you fired an employee or terminated an employee or had a transfer that caused a loss or pay or that you did something like that, there was no adverse employment action that would support a claim for First Amendment retaliation under Section 1983."  *See* Lyle Aldridge, Day 4 of Trial at 89.  As the case law cited above reflects, Defendant's argument is without merit.  Further, the Court notes that Defendant's reliance on Ninth Circuit cases such as *Nunez v. City of Los Angeles* and *Thomas v. Douglas* and his argument that such cases are most like the case at bar are also without merit. Defendant's illegitimate application of such cases to the case at bar is based on Defendant's lopsided version of the facts that largely views the evidence in the light most favorable to Defendant, draws inferences in favor Defendant, and ignores numerous favorable facts and inferences in favor of Thompson.  Moreover, Defendant simply fails to discuss or otherwise cite the numerous cases in the Ninth Circuit that are unfavorable to his position which obviously take a broad view of what is a sufficient retaliatory act for purposes of First Amendment retaliation as the analysis in these cases clearly focuses on the deterrent effect on constitutionally protected speech.

1   First Amendment retaliation claim)(internal quotes and citations omitted); *Clark v. Yosemite*

2   *Community College* District, 785 F.2d 781, 789-790 (9th Cir. 1986)(recognizing that the

3   reassignment to a different position and interference with job responsibilities in retaliation

4   for exercising constitutionally protected speech is sufficient retaliatory action to support a

5   First Amendment retaliation claim); *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1038 (9th

6   Cir. 1991)(recognizing that being penalized in a job evaluation with a poor review and

7   selective enforcement of the rules as applied to plaintiff was sufficient retaliatory action to

8   support plaintiff's First Amendment retaliation claim); *Bernasconi v. Tempe Elementary*

9   *School District No. 3*, 548 F.2d 857, 860 (9th Cir. 1977)(the retaliatory transfer of plaintiff

10  "from a position uniquely suited to her talents and desires," even though there was no loss

11  of pay or status, was a sufficient retaliatory action for purposes of First Amendment

12  retaliation); *Hyland v. Wonder*, 972 F.2d 1129, 1134-1136 (9th Cir. 1992)(dismissing plaintiff

13  as a volunteer with the government was a sufficient retaliatory action to support plaintiff's

14  First Amendment retaliation claim; also recognizing that unwanted job transfers and loss of

15  job responsibilities is adverse action and that the "type of sanction imposed to discourage the

16  exercise of First Amendment rights need not be particularly great in order to find that rights

17  have been violated.")(internal quotes and citations omitted); *Lambert v. Richard*, 59 F.3d

18  134, 135-137 (9th Cir. 1995)(receiving a letter of reprimand in retaliation for exercising

19  constitutionally protected speech supported a First Amendment retaliation claim); *Haimowitz*

20  *v. University of Nevada*, 579 F.2d 526, 529-530 (9th Cir. 1978)(failing to renew the contract

21  of a non-tenured teacher who was still on probationary status was a sufficient retaliatory act

22  for purposes of First Amendment retaliation); *McKinley v. City of Eloy*, 705 F.2d 1110, 1113-

23  1116 (9th Cir. 1983)(the discharge of a probationary employee was an adequate retaliatory

24  action to support plaintiff's First Amendment retaliation case).[20]

25

26  _____

    [20]The Court notes that in Defendant's Reply Brief, he cites two recent U.S. Supreme Court

27  cases, and argues that these two cases supposedly overturn or disapprove of a substantial portion of
    the Ninth Circuit case law pertaining to First Amendment retaliation, and that these cases apply

28  directly to the circumstances of this case. *See* Reply Brief at 5 and 8; *Burlington Northern & Sante*

1

2

3   *Fe Railway Co. v. White*, 126 S.Ct. 2405 (June 22, 2006); *Garcetti v. Ceballos*, 126 S.Ct. 1951 (May
30, 2006).  A review of these case shows, however, that Defendant once again dramatically

4   overstates the breadth of these cases as he has done throughout the Rule 50(a) and Rule 50(b)
motions.  As to *Garcetti,* the case is simply irrelevant to this case.  In *Garcetti,* the Supreme Court

5   held that an employee is not entitled to First Amendment protection where his speech is specifically
related to the official duties he must perform as part of his job.  *See Garcetti*, 126 S.Ct. at 1959-

6   1960.  In *Garcetti*, the plaintiff was a prosecutor who was required as part of his job to evaluate and
draft memos pertaining to the efficacy of search warrants.  *See id.* at 1955-1956.  In one evaluation

7   of a search warrant, the plaintiff thought that the affidavit underlying the search warrant was
inaccurate, and relayed this opinion to supervising prosecutors in the office.  *See id.*  The supervisors

8   disagreed with the plaintiff's opinion, and made the decision to proceed with the case pending the
trial court's decision on the pending motion to suppress.  *See id.*  The plaintiff then testified in favor

9   of the defendant when called by defense counsel at the suppression hearing, but the trial court denied
the motion to suppress and held that the warrant was valid.  *See id.*  Thereafter, the supervising

10   prosecutors retaliated against him.  *See id.*  In this very narrow situation, the Supreme Court held

11   that: "[Plaintiff wrote his disposition memo because that is part of what he . . . was employed to do
. . . The significant point is that the memo was written pursuant to [plaintiff's] official duties.

12   Restricting speech that owes its existence to a public employee's professional responsibilities does
not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the

13   exercise of employer control over what the employer itself has commissioned or created." *Id.* at

14   1960.  Contrary to *Garcetti*, Thompson was not employed as an operator by Tucson Water such that
her normal job duties would include investigating and reporting violations to the fire department

15   pertaining to Tucson Water's dangerous handling, transportation, and disposal of hazardous waste;
*Garcetti* is inapposite to this case.  Furthermore, contrary to Defendant's assertion, the *White* case

16   is actually favorable to Thompson's case and is consistent with the Ninth Circuit case law discussed

17   in this Order.  First, the Court notes that Defendant asserts that the *White* case shows that there was
a split in the Circuits as to what constituted adverse action for retaliation.  However, Defendant

18   conveniently omits the fact that the *White* case was a Title VII case and that the split in the Circuits
was based on varying statutory interpretations of Title VII between the anti-discrimination

19   provisions and the anti-retaliation provisions of the statute; this scenario obviously doesn't apply to

20   the First Amendment retaliation context in this case.  *See White*, 126 S. Ct. at 2408-2409, 2410-
2417.  Further, Defendant also argues that the amount of injury that must be shown to support a First

21   Amendment retaliation claim has somehow increased and altered the law in the Ninth Circuit
because the Supreme Court said a retaliatory action must be "materially adverse."  *Id.* at 2415.

22   However, even in the Title VII context, the Supreme Court went on to define a "materially adverse"

23   action as one that "well might have dissuaded a reasonable worker from making or supporting a
charge of discrimination . . . this standard will screen out trivial conduct while effectively capturing

24   those acts that are likely to dissuade employees from complaining or assisting in complaints about

25   discrimination" *Id.* at 2415-2416 (internal quotes and citations omitted).  This standard is strikingly
consistent with the Ninth Circuit's focus on actions that would deter and chill protected speech.  In

26   addition, the Supreme Court went on to explain: "We phrase the standard in general terms because
the significance of any given act of retaliation will often depend upon the particular circumstances.

27   Context matters. The real social impact of workplace behavior often depends on a constellation of
surrounding circumstances, expectations, and relationships which are not fully captured by a simple

28   recitation of the words used or the physical acts performed . . . A schedule change in an employee's

- 25 -

In light of the clearly established law in 1998, there is no question that the retaliatory actions taken against Thompson are sufficient to support a First Amendment retaliation claim.  The campaign of harassment that Ring directed at Plaintiff far exceeded the severity of the retaliatory actions taken in many of the Ninth Circuit cases cited above.[21]  After Ring discovered that Thompson blew the whistle on his illicit handling, transportation and disposal of hazardous waste, Ring proceeded, on numerous occasions, to scream and cuss at her, get in her face, slam things near her, physically intimidate her, deprived her of duties at the TARP facility, placed her in physically dangerous situations by throwing a sump pump directly at her and by directing activities that undermined Thompson's ability to ensure her safety while she was working with ozone, and by specifically approving a poor evaluation (which resulted in the loss of a merit raise) of Thompson that was caused by Ring's own campaign of harassment.  As such, a reasonable official would have known that the conduct at issue in this case would violate Thompson's constitutional rights based on the clearly established law at the time.

Accordingly, based on the foregoing discussion, the Court finds that Ring is not entitled to qualified immunity and denies all other grounds for relief advanced in Defendant's Amended Renewed Motion for Judgment as a Matter of Law.

---

work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children . . . A supervisor's refusal to invite an employee to lunch is normally a trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.  Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an act that would be immaterial in some situations is material in others." *Id.*  A fair reading of *White* shows that the case is favorable to Thompson's position.

[21]The Court will not repeat the entire discussion regarding the numerous retaliatory acts Ring took against Thompson during his extended campaign of harassment.  Rather, the Court relies on the extensive discussion and the citations in the Factual Background section of this Order.

IV.  **CONCLUSION**

IT IS HEREBY ORDERED as follows:

(1) Defendant's Amended Renewed Motion for Judgment as a Matter of Law is **denied**.

(2) Thompson may submit a supplement to the Motion for Attorney's Fees for the time and costs incurred by having to respond to Defendant's post-verdict motions.  If Thompson chooses to file such a supplement, it shall be filed within **30 days of the filing date of this Order.  To the extent a response and reply are filed in relation to the supplement, the time frames shall be governed by the Local Civil Rules**.

DATED this 27th day of October, 2006.

FRANK R. ZAPATA
United States District Judge